IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Javier Flores-Aldape, | Case No. 3:15 CV 2076 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Fatin Shawki Kamash, | |
| Defendant. | |

### INTRODUCTION

Plaintiff Javier Flores-Aldape petitions for the return of his minor child, C.F., under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.* Javier alleges C.F. is being wrongfully retained in the United States by her mother, Defendant Fatin Shawki Kamash, and seeks C.F.'s immediate return to Mexico. Fatin argues C.F. has not been wrongfully retained because her habitual residence is the United States. Fatin also argues exceptions to the Hague Convention prevent C.F.'s return to Mexico.

This Court held an evidentiary hearing in this matter on June 13, July 8, and July 14, 2016. This Court also reviewed pre- and post-trial briefs from both parties (Docs. 29, 37, 45–46).

### FINDINGS OF FACT

**The Courtship**

Fatin and Javier met online in the summer of 2009 (Doc. 48 at 64–65). Javier is a Mexican citizen who, at the time, was studying for a Master's degree in Germany (*id.* at 65). Fatin, an Iraqi native, was a U.S. resident; she has since become a naturalized U.S. citizen (Tr. Ex. 70). In February

2011, Javier found a job in Mexico as an aviation engineer for General Electric (Doc. 48 at 67). Later that year, Fatin traveled to Mexico with her father to visit Javier. While there, they toured a house Javier was considering purchasing (*id.* at 37, 53–54, 69–71). Javier bought the house and moved in while it was being renovated (*id.* at 71–72).

In March 2012, Javier and his family traveled to Michigan to celebrate Javier and Fatin's engagement (*id.* at 41). The Flores-Aldape and Kamash families held an extended family meeting to discuss the couple's future. Fatin's brothers, in particular, sought a commitment from Javier that he would support Fatin in pursuing a second degree in pharmacy (Doc. 49 at 3–4, 27–28). Javier confirmed he fully supported Fatin's goals and wanted to find work in the United States so the family could live here long term (*id.*). A few months later, Fatin visited Javier in Mexico again for about a week. She checked on the renovations at the house and looked for a wedding dress (Doc. 48 at 72–73). Javier and Fatin married in November 2012 in Troy, Michigan (Tr. Ex. 2).

The next month, Fatin moved to Querétaro, Mexico on a visitor's visa (Doc. 48 at 80). She did not have a job in Mexico, but instead took some Spanish classes and assisted in renovating and decorating the family home (Doc. 49 at 20–21, 76; Tr. Exs. 41, 43(a)–(b), 43(e), 45(a)). Javier and Fatin looked into applying for a Mexican residency permit for Fatin but did not proceed with the paperwork (Doc. 48 at 80–82).

**C.F.'s Birth**

Fatin learned she was pregnant in July 2013. The next month, she returned to the United States in anticipation of an immigration interview scheduled for September 2013 (Doc. 48 at 243–44). While in Michigan, Fatin enrolled in classes at Oakland Community College and worked as a math and chemistry tutor (*id.* at 260; Tr. Ex. 61). She became a U.S. citizen in November (Tr. Ex. 70).

C.F. was born in Mount Clemens, Michigan on March 30, 2014 (Tr. Ex. 4).  Javier traveled to Michigan for the birth and returned to Mexico about a week later (Doc. 48 at 125–26).

Fatin and C.F. remained in Michigan for four months.  C.F. saw a Michigan pediatrician regularly (Tr. Exs. 57–58), and Fatin continued her work at Oakland Community College (Doc. 48 at 222).  During this time, Javier and Fatin began the U.S. visa application process for Javier (*id.* at 133–35).  In May 2014, Fatin submitted a petition for alien relative on Javier's behalf, and the petition was approved later that month (Tr. Exs. 69–71).  In late July 2014, Fatin and C.F. flew to Mexico on round-trip tickets, with a return date in April 2015.[1]  Fatin left many of her belongings, including her car and some of C.F.'s clothing, toys, and baby supplies, at her parents' home, which she maintained as a mailing address (Doc. 48 at 204–05; Doc. 49 at 9–10, 41).  Fatin and Javier also maintained their joint U.S. bank account (Tr. Ex. 85).

**Life in Mexico**

Fatin, Javier, and C.F. lived together in the family's home in Querétaro, and C.F. was baptized in Mexico in August 2014 (Tr. Ex. 5).  Later that month, Javier lost his job with General Electric (Tr. Ex. 8), but the family remained in Mexico, living off Javier's savings and receiving additional financial support from his parents (Doc. 49 at 91).  C.F. received her vaccinations from a Mexican pediatrician (Tr. Ex. 35) but, given her young age, she was not enrolled in daycare or any extracurricular activities and had limited interaction with the community beyond her own family (Doc.

---

[1] The parties contest why they opted for round-trip tickets.  This Court finds that Javier purchased the round-trip tickets both because they were the more affordable option and because Javier and Fatin knew that Fatin and C.F. would return to the United States at some point, either to visit family or on a permanent basis with Javier, depending on Javier's visa and employment status.

48 at 133, 200–02). Fatin obtained a Mexican permanent resident card[2] and opened a bank account in her name in Querétaro (*id.* at 90–92; Tr. Exs. 7, 22). With Javier's consent, and in light of his unemployment, Fatin also renewed the Medicaid insurance for herself and C.F. (Doc. 48 at 205–06; Tr. Ex. 66).

In the spring of 2015, the family celebrated C.F.'s first birthday (Doc. 48 at 100–01; Tr. Ex. 13) and vacationed with Javier's family in Mexico (Doc. 48 at 48). Meanwhile, Javier sought employment in Mexico (*id.* at 50–51; Tr. Ex. 27) and also considered applying to a Ph.D program at the Universidad Nacional Autonoma de México (Doc. 49 at 91). At the same time, Fatin and Javier continued to pursue Javier's U.S. visa application (Doc. 48 at 217–18; Tr. Ex. 73), and Fatin applied and was accepted to the pharmacy program at The University of Findlay in Ohio for the fall 2015 semester (Tr. Ex. 64).

**Fatin & C.F. Visit the United States**

At some point, Javier and Fatin's relationship deteriorated, and they discussed the possibility of divorce (Doc. 48 at 143–44). Fatin and C.F. were originally scheduled to fly to Michigan on April 30. However, Fatin suffered an epileptic seizure that day and had to reschedule their flight (*id.* at 94). When Fatin and C.F. left for Michigan on May 10, 2015, Javier drove them to the airport, and Fatin and Javier parted on good terms (*id.* at 46, 144, 151). Fatin and C.F. left their winter clothes and many of their other belongings, including C.F.'s toys and crib, in Mexico (*id.* at 110–14; Ex. 20). Upon her arrival in Michigan, Fatin resumed her part-time tutoring work at Oakland Community

---

[2] The parties also vigorously contest whether Fatin intentionally sought permanent residency status, or whether she thought the card was merely to facilitate opening a Mexican bank account (Doc. 48 at 174–79; 252–55). Ultimately, this discrepancy has little bearing on this Court's analysis, as the parties agree that Fatin applied for the permanent resident card to facilitate the family's life in Mexico.

College (Tr. Ex. 62) and enrolled C.F. in daycare (Tr. Ex. 83). Fatin also applied for and received WIC and child care assistance benefits in Michigan (Tr. Exs. 66(b), 68). While still in Mexico, Javier arranged for the payment of his Immigrant Visa ("IV") application processing fee in early July 2015 (Doc. 48 at 140–41; Tr. Exs. 75, 77).

Though Javier and Fatin stayed in touch during the summer, their communications were strained (Tr. Exs. 9, 25, 26, 44, 75, 81, 82). Javier spoke to C.F. via Skype on a few occasions (Doc. 48 at 227–28) and provided limited financial support to Fatin and C.F (Doc. 49 at 48–49, 56; Tr. Exs. 42, 44, 82). Tensions came to a head during a phone call in the first week of August, when Fatin informed Javier that she and C.F. would not be returning to Querétaro. The parties dispute whether this news came as a surprise to Javier. Javier claims they agreed the visit to Michigan would last only three months, corresponding with the summer session at Oakland Community College (Doc. 48 at 119, 149), while Fatin maintains it was indefinite, and she never intended to go back to Mexico. Fatin claims Javier knew she had been admitted to The University of Findlay for the fall 2015 semester (*id.* at 196–97, 232–33), and he planned to follow her to the United States once she "reestablish[ed]" herself (*id.* at 199). Javier asserts he did not know of Fatin's plans to move to Ohio; in fact, as referenced below, he hired a private investigator to locate Fatin in order to file the Petition in the correct court (*id.* at 119–20; Doc. 49 at 89).

**Intent to Return to Mexico**

In short, the parties offer competing accounts of their plans for the family's future. This Court credits Fatin's testimony, supported by other evidence in the record, that she and Javier desired to eventually create a long-term home in the United States. But this Court finds the parties did not share

5

a present intention to begin that process with Fatin and C.F.'s May 2015 trip to Michigan.  In a June 2015 e-mail, Javier outlined the parties' agreement for that trip (Tr. Ex. 9):

- I remind you that I consented you [sic] to take her as long as was I [sic] going to be able to speak to her and to have a video phone call with her in Skype, twice a week. . . .

- I consented you [sic] to take her understanding that you promised to return with her back to Mexico after the summer period in the college is over. . . .

- Finally, I also remind you that for the time being our residence is here in Mexico, something that you agreed with.  I am only waiting [sic] the proper conditions to happen to be able to move to the US.  Something I promised and I sustain.

A few days later, Fatin confirmed the trip was meant to be limited in duration, writing "[y]ou know that I still have one and a half month [sic] to stay here.  So I need you to send me some money please" (Tr. Ex.44).  Fatin's attempt to offer an alternative explanation for her e-mail (Doc. 50 at 5–6) is neither credible nor persuasive.

Following their early August phone call, Javier e-mailed Fatin and protested "[y]ou are killing me by separating me from [C.F.] Since the day you told me that you were not going to respect the agreement we had. [sic]  I cannot concentrate in anything, I cannot sleep, I am totally lost with a constant void in my heart.  You have stolen my baby from me, and you have stolen all the trust I had in you" (Tr. Ex. 42).  On September 9, 2015, Javier filed a Hague Convention application with the Mexican authorities (Tr. Ex. 6).  He also initially filed a petition for the return of C.F. in federal court in Michigan (Tr. Ex. 14).  That petition was dismissed without prejudice (Tr. Ex. 19), as Fatin and C.F. had moved to Findlay, Ohio, where Fatin was enrolled in school.  On October 7, 2015, Javier re-filed the Petition in this Court (Doc. 1).

6

**CONCLUSIONS OF LAW**

**The Hague Convention and ICARA**

The Hague Convention seeks "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I*") (quoting Hague Convention Preamble). It aims to restore the pre-removal or retention status quo and to deter parents from engaging in self-help by crossing international borders in search of a more sympathetic forum to resolve their custody disputes. *Id.* The United States and Mexico are both signatories to the Hague Convention.

This Court's jurisdiction is limited to deciding the wrongful removal or retention claim; it may not address the merits of the underlying custody dispute. 22 U.S.C. § 9001(b)(4); Hague Convention, Art. 19; *see also Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007). Under the Hague Convention, as implemented by ICARA, a child who has been wrongfully removed or retained must be promptly returned to his or her country of habitual residence, unless one of the narrow exceptions provided by the Convention applies. The removal or retention of a child is "wrongful" within the meaning of the Hague Convention where:

> (a) it is in breach of the other parent's rights of custody -- defined as rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence -- under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been exercised but for the removal or retention.

7

Hague Convention, Arts. 3, 5. It is the petitioning parent's burden to prove by a preponderance of the evidence that the removal or retention was "wrongful." 22 U.S.C. § 9003(e)(1)(A); *see also Panteleris v. Panteleris*, 601 F. App'x 345, 348 (6th Cir. 2015).

If the petitioner establishes a prima facie case for returning the child, the burden shifts to the respondent to prove one of the following affirmative defenses, 22 U.S.C. § 9003(e)(2):

> (1) the petitioner was not actually exercising rights of custody at the time of the removal or retention, or the petitioner consented to or subsequently acquiesced in the removal or retention (Hague Convention, Art. 13a);
> 
> (2) the child objects to being returned and has reached an age and maturity level at which it is appropriate to consider his or her views (Hague Convention, Art. 13);
> 
> (3) there is a grave risk returning the child would result in physical or psychological harm, or an otherwise intolerable situation (Hague Convention, Art. 13b);
> 
> (4) returning the child would violate policies regarding the protection of human rights and fundamental freedom (Hague Convention, Art. 20); or
> 
> (5) the proceeding commenced more than a year after the removal or retention, and the child is now settled in his or her new environment (Hague Convention, Art. 12).

In this case, Javier claims both wrongful removal and wrongful retention. Fatin responds that the United States, not Mexico, is the child's country of habitual residence, so there can be no wrongful removal or retention within the meaning of the Hague Convention. Alternatively, she argues Javier was not actually exercising custody rights at the time of the removal or retention; he consented or acquiesced in the removal or retention; and C.F. is now settled in her new environment in the United States.

**Javier's Prima Facie Case**

*Wrongful Removal or Retention*. Javier contends Fatin misrepresented her intentions to induce him into allowing C.F. to travel to the United States with her in May 2015. He claims he

8

consented to the trip based on his understanding that Fatin and C.F. would return to Mexico in mid-August, at the conclusion of the summer session at Oakland Community College. Since Fatin never had any intention of returning to Mexico, Javier argues, she obtained this agreement under false pretenses, and his consent is void.

Assuming this version of events is correct, Javier still fails to prove a wrongful removal. No legal authority supports the proposition that the removing parent's misrepresentation of her motivations voids the petitioning parent's initial consent to removal, and courts have declined to characterize similar situations as wrongful removal cases. *See, e.g.*, *Roche v. Hartz*, 783 F. Supp. 2d 995, 1002 (N.D. Ohio 2011) (rejecting petitioner's contention that use of "misrepresentation to induce him into agreeing to the trip" constituted wrongful removal of the child); *McKie v. Jude*, 2011 WL 53058, at *6 (E.D. Ky. 2011) (declining to "recast" initial removal as wrongful "once Respondent exceeded the scope of [Petitioner's] consent to remain in the United States"). Instead, "[t]he case law reflects in cases where the petitioning parent initially gave consent for the child to travel to another country for some period of time," retention of the child in that country becomes wrongful only when the petitioning parent clearly "communicates that he or she no longer consents to the child remaining in that country." *Selo v. Selo*, 929 F. Supp. 2d 718, 727 (E.D. Mich. 2013); *see also Karkkainen v. Kovalchuk*, 445 F.3d 280, 290 (3d Cir. 2006) (holding wrongful retention began once petitioning parent "clearly communicated her opposition to [the child's] presence in the United States").

Javier consented to C.F. traveling to Michigan with Fatin in May 2015. It became clear Fatin and C.F. were not returning to Mexico in early August 2015, following Fatin and Javier's phone conversation. Javier objected when he wrote to Fatin, "[y]ou have stolen my baby from me" (Ex. 42).

9

This Court concludes the August 5 e-mail clearly communicated Javier's opposition to C.F. remaining in the United States. Accordingly, August 5, 2015 is the date of C.F.'s retention.

*Country of Habitual Residence*. Whether that retention was "wrongful" within the meaning of the Hague Convention depends on C.F.'s country of habitual residence immediately preceding the retention. If C.F. was a habitual resident of the United States as of August 4, 2015, her retention was not wrongful. However, if she was a habitual resident of Mexico on that date, her retention was wrongful under the Hague Convention, and she must return to Mexico unless Fatin proves an affirmative defense under one of the Convention's narrow exceptions.

Neither the Hague Convention nor ICARA defines the term "habitual residence," but the Sixth Circuit has held "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Robert*, 507 F.3d at 989 (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)). The Sixth Circuit has also held this inquiry "must focus on the child, not the parents, and examine past experience, not future intentions." *Friedrich I*, 983 F.2d at 1401. A person "can have only one habitual residence," and "a change in geography and the passage of time" are required to establish a new habitual residence. *Id.* at 1401–02.

*Subjective Parental Intent*. Unlike the other Circuits to consider this issue, the Sixth Circuit has repeatedly rejected the subjective intent of the parents as an additional factor in determining the child's habitual residence. Nevertheless, it has also recognized that parental intent may be a valid consideration in cases involving very young children or children with developmental disabilities. *See, e.g.*, *Robert*, 507 F.3d at 992 n.4 ("[A] very young or developmentally disabled child may lack cognizance of their surroundings sufficient to become acclimatized to a particular country or to

10

develop a sense of settled purpose"); *Panteleris*, 601 F. App'x at 350 (quoting *Robert*, 507 F.3d at 992 n.4); *Simcox v. Simcox*, 511 F.3d 594, 602 n.2 (6th Cir. 2007) (citing *Friedrich I*, 983 F.2d at 1401–02). At least two courts in this Circuit have considered the subjective intent of the parents in determining the habitual residence of an infant. *See Holmes v. Holmes*, 887 F. Supp. 2d 755, 758 (E.D. Mich. 2012); *McKie*, 2011 WL 53058, at *10 (citing cases in other Circuits).

This Court agrees parental intent is an appropriate consideration in cases like these. C.F. was just four months old when she left the United States for Mexico, and fourteen months old when she returned to visit family in Michigan. A child of that age is "too young to form any meaningful connection to a country, its inhabitants, and its locations." *McKie*, 2011 WL 53058, at *9 (citing *Robert*, 507 F.3d at 992 n.4). Her experience of the world is limited to the environment created by her parents, and she will likely "acclimatize" quickly to any residence in which her family and daily routines are present, regardless of geographic location. *See, e.g.*, *Holder v. Holder*, 392 F.3d 1009, 1020–21 (9th Cir. 2004) ("[It] is practically impossible for a newborn child, who is entirely dependent on its parents, to acclimatize independent of the immediate home environment of the parents."); *Delvoye v. Lee*, 329 F.3d 330, 333 (3d Cir. 2003) ("[I]n practice it is often not possible to make a distinction between the habitual residence of a child and that of its custodian. Where a child is very young it would, under ordinary circumstances, be very difficult for him . . . to have the capability or intention to acquire a separate habitual residence.") (quoting Beaumont & McEleavy, *The Hague Convention on Internat'l Child Abduction* 91 (1999)).

Of course, the question of parental intent becomes significantly more complicated when a child's parents disagree on where the child should live, as is often true in Hague Convention cases. Other courts to consider these issues have identified three broad categories of cases involving

11

conflicting parental intent. In the first category, a family demonstrates a settled intent to change habitual residence, even if one parent expresses reservations. Most often, this means a family moves together "under circumstances suggesting that they intend to make their home in the new country." *Mozes v. Mozes*, 239 F.3d 1067, 1076–77 (9th Cir. 2001). The second category comprises cases where a child's stay abroad is intended to be for a "specific, delimited period." *Id.* at 1077. The third category of cases falls in the middle of this spectrum, when one parent consents to the child's stay abroad for "some period of ambiguous duration." *Id.*

In this case, although C.F. was born in the United States, the circumstances reflect Fatin and Javier's settled purpose to make their home -- at least for the foreseeable future -- in Mexico. "[A] settled purpose need not be an intent to remain in a location permanently." *Silvestri v. Oliva*, 402 F. Supp. 2d 378, 385 (D.N.J. 2005). Rather, what matters is whether the parents do "what parents intent on making a new home for themselves and their child do." *Feder*, 63 F.3d at 224. Javier and Fatin established their marital home in Querétaro soon after their wedding, and they jointly participated in renovating the residence according to their preferences. This house is the only place where Javier, Fatin, and C.F. lived together as a family. Javier and Fatin chose to set up their household in Mexico in large part because Javier had a job there (*see, e.g.*, Doc. 49 at 30). After Javier lost his job at General Electric, he sought other employment and considered pursuing a Ph.D program in Mexico. When Fatin and C.F. returned to Mexico in July 2014, C.F. was baptized there, and Fatin obtained a permanent resident card and opened a bank account in her name. These are all things parents do to create a home for their family.

Javier and Fatin also shared an intention to relocate to the United States *someday*. This conversation began before they were married and continued even after Fatin and C.F. returned to

Michigan. Javier discussed at length his desire to find employment in the United States, and Fatin certainly made plans to continue her education and provide for C.F. here. But to determine C.F.'s habitual residence, this Court must look to the parents' last moment of *shared* intent. The testimony and other evidence presented to this Court reflect that as of August 2015, Javier and Fatin had not jointly decided to abandon their residence in Mexico and move the family to the United States. This Court does not doubt that Fatin felt isolated in Querétaro and wished to return to her work, schooling, and family in Michigan. However, her "change of mind does not alter the parents' initial shared intent" to establish their family residence in Mexico. *Silvestri*, 403 F. Supp. 2d at 386. Absent an agreed plan to abandon their home in Mexico, C.F.'s temporary visit to the United States during the summer of 2015 cannot create a new habitual residence.

Accordingly, this Court must order C.F.'s return to Mexico unless Fatin can establish an affirmative defense under one of the narrow exceptions outlined in the Hague Convention and ICARA. Each of Fatin's defenses is subject to a preponderance of the evidence standard. 22 U.S.C. § 9003(e)(2).

**Fatin's Affirmative Defenses**

*Actual Exercise of Custody Rights*. To prevail on this defense, Fatin must show that Javier was not actually exercising his custody rights at the time of C.F.'s retention. 22 U.S.C. § 9003(e)(2). Under the Hague Convention, parental custody rights are defined by the law of the child's country of habitual residence. Javier has submitted affidavits from two licensed Mexican attorneys interpreting the legal concept of *patria potestas*, or parental authority (Exs. 15–16). Courts in this Circuit have also interpreted Mexican custody law in previous Hague Convention cases. In short, the Civil Code for the State of Querétaro provides that both parents jointly exercise *patria potestas*,

13

defined as "the set of rights and obligations recognized by law . . . to care for, protect, educate and legally represent" a child (Ex. 15 at 2). *See also Guevara v. Soto*, 2016 WL 1558384, at \*6 (E.D. Tenn. 2016) (same); *Mendoza v. Esquivel*, 2016 WL 1436289, at \*8 (S.D. Ohio 2016) (interpreting *patria potestas* doctrine under Michoacán Family Code).

It is well established that courts "liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child," such that a parent "cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich v. Friedrich*, 78 F.3d 1060, 1065–66 (6th Cir. 1996) ("*Friedrich II*"); *see also Panteleris*, 601 F. App'x at 348 (burden satisfied if parent exercised custody rights "in any manner"). This inquiry does not include an evaluation of how well (or badly) the parent exercised his or her rights -- that determination belongs to the custody tribunal and is beyond the jurisdiction of this Court. *Friedrich II*, 78 F.3d at 1065 ("[A]n American decision about the adequacy of one parent's exercise of custody rights is dangerously close to forbidden territory: the merits of the custody dispute.").

This Court concludes there has been no such clear, unequivocal abandonment here. Javier tried to stay in contact with C.F. after she and Fatin traveled to Michigan, though Fatin suggests his efforts tapered quickly, and he provided only limited financial support that summer. Nevertheless, these circumstances do not rise to the level of a "long period of unexplainable neglect of the child [that] could constitute non-exercise of otherwise valid custody rights under the Convention." *Friedrich II*, 78 F.3d at 1066.

***Consent or Acquiescence***. As discussed above, Javier consented to C.F.'s initial removal from Mexico. The relevant inquiry now is whether he acquiesced to C.F.'s retention in the United

States. Acquiescence requires either (1) a formal act or statement, such as testimony in a judicial proceeding, (2) a written renunciation of rights, or (3) a consistent attitude of acquiescence over a significant period of time. *Friedrich II*, 78 F.3d at 1070. As with all exceptions under the Hague Convention, this defense must be narrowly construed, and "[e]ach of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." *Id.*; *see also Nicolson v. Pappalardo*, 605 F.3d 100, 107 (1st Cir. 2010) (holding protection from abuse consent order did not constitute acquiescence to granting custody to other parent); *Panteleris*, 601 F. App'x at 352 (finding defense not satisfied where father asked mother to return the children).

There is no evidence Javier made a formal oral statement or a written renunciation of either his right to return C.F. to Mexico or his parental rights more generally. Nor has he consistently behaved in a manner suggesting he agreed to C.F.'s retention in the United States. To the contrary, Javier sent Fatin several e-mails objecting to C.F.'s continued absence from Mexico (Tr. Exs. 33–34, 42), and he promptly initiated Hague Convention proceedings upon learning Fatin would not return with C.F. to Querétaro. *Cf. Guevara*, 2016 WL 1558384, at *9 (no acquiescence where father "actively sought custody of his child, through local and international channels, from the time the child disappeared through his filing the instant petition"). Javier did not acquiesce in C.F.'s retention.

***"Now Settled" Defense.*** The parties dispute the merits of the "now settled" defense under Article 12 of the Hague Convention (Doc. 50 at 32–42). Based on Fatin's pre- and post-trial briefs (Docs. 29, 45), it is not clear she actually advances this defense, as opposed to arguing that C.F.'s habitual residence is the United States based on acclimatization and "settled purpose" -- a separate inquiry. However, to the extent Fatin seeks to assert a "now settled" defense, it is inapplicable here. Javier filed his Petition in this Court in October 2015, just two months after C.F.'s retention. *See*

15

Hague Convention, Art. 12; *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1234 (2014) ("Before one year has elapsed, Article 12 provides that the court 'shall order the return of the child forthwith.' . . . But even after that period has expired, the court 'shall also order the return of the child, unless it is demonstrated that the child is now settled.'"); *Guevara*, 2016 1558384, at *10 (citing *Lozano*). Because Javier filed the Petition "before one year . . . elapsed," this Court need not reach the question of whether C.F. is "now settled" in the United States.

## CONCLUSION

It is unfortunate that Javier and Fatin's marital difficulties have led to this tug of war -- two families in two different countries, lost employment opportunities for Javier and educational opportunities for Fatin, and a child caught in the middle. This Court attempted to help the parties reach an amicable resolution to this case (*see* Docs. 12, 14, 24), which was ultimately unsuccessful. Much as this Court might like to continue to mediate the dispute, it is not a family court. The time has come to reach a final decision on Javier's Hague Petition, and to allow the parties to proceed in resolving their divorce and custody case in the appropriate jurisdiction. Moving forward, perhaps the parties and their respective families will choose an alternative to continued litigation.

In accordance with the principles outlined in the Hague Convention and ICARA, this Court grants Plaintiff Javier Flores-Aldape's Petition for the return of C.F. to Mexico. The parties, through counsel, shall attempt to reach an agreement regarding the details of (1) the time and manner of C.F.'s return and (2) any costs or expenses under 22 U.S.C. § 9007. If the parties are unable to resolve these issues promptly, counsel shall contact Chambers for further direction.

IT IS SO ORDERED.

s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

August 22, 2016